UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | Chapter 12 |
| DLB II, LLC, | Bankruptcy No. 22-00834 |
| Debtor | |

## OPINION AND ORDER

The matters before the Court are three motions and objections to those motions in the bankruptcy case of DLB II, LLC ("DLB II"): Motion to Dismiss Case (Doc. 14) filed by Moana Management, LLC ("Moana") with Debtor's Objection to the Motion to Dismiss (Doc. 33); Motion to Amend after Trial (Doc. 93) filed by Moana with Debtor's Objection to the Motion to Amend (Doc. 97); and Motion for Sanctions for Violation of the Automatic Stay (Doc. 98) filed by Debtor with Objection to Sanctions (Doc. 105) filed by Moana.

Secured creditor Moana moved to dismiss the case, arguing that DLB II does not qualify as a family farming operation and is therefore ineligible for Chapter 12 relief. Moana also argues that the case should be dismissed because DLB II has engaged in fraud. In the alternative, Moana has requested adequate protection. The Court held evidentiary hearings on the Motion to Dismiss on April 20, 2023, and May 4, 2023. After the hearing, Moana moved to amend its Motion to Dismiss to add an alternative Motion to Convert the Case to Chapter 7. The Court held a hearing telephonically on this issue on June 23, 2023. In the matter, the following attorneys appeared: Erica Yoder for Debtor, John Duffy for Moana, and Carol Dunbar for herself as Chapter 12 Trustee. For the reasons that follow, the Court grants Moana's

Motion to Amend to add conversion as a remedy and concludes the case should be converted to Chapter 7. The Court also denies Debtor's Motion for Sanctions. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## I. FINDINGS OF FACTS

In 2018, Doug Bell formed two separate LLC entities: DLB II (Debtor here) and DLB III (non-debtor). Bell formed the separate companies to attempt to protect two different parcels of land he owned from tax liens against him. DLB II contained the land he owned at 3590 Heather Lane near Thornton, Iowa. DLB III contained the land he owned at 2492 Indigo Road in Franklin County, Iowa.

In March 2019, Bell filed his Biennial Report for DLB II with the Iowa Secretary of State. Bell stated in the Report that DLB II was not a "family farm limited liability company." He further stated DLB II did not "hold an interest in agricultural land in Iowa." In March 2021, he filed another Biennial Report for DLB II and made the same assertions.

On March 11, 2021, he sought a loan for DLB II from Moana, the secured creditor here. Bell asserted that the loan was for fixing up buildings—including a house on the land at 3590 Heather Lane, where DLB II operated. He also wanted the loan to purchase farm equipment to fix up and resell—which was his only business at 3590 Heather Lane.

Margaret "Peggy" Palms, manager of Moana, testified that Bell never disclosed any agricultural activity at all by DLB II. Palms said he never mentioned anything about crop farming or cattle raising that he did individually or through DLB III, his other entity. Moana does not do agricultural lending and would not have been a lender for Bell or his entities if he was involved in agriculture.

Palms did due diligence before making the loan to Bell or DLB II. In addition to inquiring about the purpose of his loan and his equipment repair business, she

checked on his biennial corporate filings with the Secretary of State. Those filings specifically stated that DLB II was not a family farming business and did not hold an interest in agricultural land. Palms also had an appraisal done for the property at 3590 Heather Lane. The appraisal report came back with a valuation, pictures, and a property description that revealed only a farm equipment repair and resale business, not any farming operation.

Palms also discovered during her due diligence that Bell had a previous conviction for felony swindling. She and Bell discussed that conviction, and he assured her that he had changed his ways and was now a respectable businessman. She believed him and proceeded with the loan. Because the loan was higher risk, and the Heather Lane property was limited in value, Palms decided Moana needed additional security. Bell pledged the property in DLB III as additional security and agreed to personally guarantee the loan.

The loan documents reveal the purpose of the loan at Paragraph 10 of the Promissory Note, "Business Loan," which states:

> Borrower acknowledges that borrower is engaged in the business of investing in real and personal property that the proceeds of the Private Business Loan represented by this Note are being used to purchase and rehabilitate real and personal property that borrower intends to resell for profit. Borrower understands and specifically acknowledges that this is a Private Business Loan for business purposes only and is not for personal, family, household, or any other purposes.

Palms notes the only business ever discussed or disclosed was Bell buying, fixing, and reselling farm equipment and increasing the value of the land at Heather Lane by fixing its structures—consistent with the above provision.

DLB II made only one payment on the loan before it went into default. Debtor also failed to pay taxes or get the appropriate insurance, which Moana was forced to

provide.  Moana was forced to foreclose on its security interests against the DLB II property at Heather Lane and the DLB III property at Indigo Road.

Eventually, Moana and DLB II, through Bell, entered into a Consent Decree of Foreclosure. The Consent Decree provided that Moana would foreclose first against the DLB II property at Heather Lane. The Decree stated that the sheriff's sale of the Heather Lane property would be completed before the sheriff's sale was even scheduled for the DLB III property at Indigo Avenue.  The Decree also specifically stated—as a conclusion of law—that the Heather Lane "real estate is not used as agricultural land and not the residence of either defendant."  The Iowa District Court for Cerro Gordo County entered the Consent Decree on June 15, 2022.  Bell later moved to set aside the Consent Decree, but the court denied the motion as untimely and because Bell could not appear himself to represent DLB II (a corporate entity). Bell and DLB II had been represented at the time the Consent Decree was negotiated and entered by the court.

The foreclosure sale was rescheduled to January 3, 2023.  On December 29, 2022, DLB II filed for Chapter 12 bankruptcy to stop the foreclosure sale on the property at Heather Lane.  Bell and DLB III did not file.  DLB II listed its total assets as $255,500and its total debt as $261,190. DLB II also listed $83,000 in farm assets.

Moana moved to dismiss, arguing that DLB II does not qualify for Chapter 12 relief. In particular, Moana argued DLB II was not a family farm, did not have 80% of its assets involved in farming, and did not have farm debt that was at least 50% of his total debt.  DLB II argued it met the definitions to qualify for Chapter 12 relief because it had a cattle operation, that the Heather Lane property was a farm asset, and that the Moana loan was a farm liability.

Moana then amended its Motion to Dismiss arguing that DLB II committed fraud in making these allegations, which is a separate ground for dismissal. DLB II listed cattle on its schedules as an asset worth $70,000 and consisting of thirty-seven

4

calves, thirty-nine stock cows, seven heifers, and one bull.  Bell testified that the DLB II cattle were kept at the Indigo Avenue property under a lease with DLB III. Bell said there was no lease document and DLB III did not charge rent because it was also owned by him.

Moana pointed out that Bell never mentioned farming as part of the loan application process for DLB II, there was no sign of farming at Heather Lane, and Moana did not make agricultural loans.  Moana also pointed out that in the filings Palms reviewed before making the loans, DLB II specifically stated it was not a family farm company and did not own farmland.

Moana also presented evidence that Bell sold whatever cattle he, DLB III, or DLB II owned—long before bankruptcy.  Dylan Mueller testified that he bought all of the cattle in March of 2022 after Bell called asking him to buy the cattle.  The Sheriff of Franklin County had received many complaints about the cattle Bell kept at Indigo Avenue (DLB III), primarily about the cattle constantly getting out and onto other people's property in search of food.  Mueller arrived at Indigo Avenue and found the cattle were emaciated, obviously from being severely underfed or not fed at all for quite some time.  Mueller said Bell was embarrassed and did not want people to see—or continue to see—his starving cattle.  Bell wanted $20,000 for the herd.  Mueller offered $10,000.  They settled on $16,000, a price reflecting the poor health condition of the cattle.

Mueller went to the local bank and borrowed money for the first payment of $10,000.  The promissory note for the loan and the $10,000 check Mueller provided Bell (and that Bell endorsed and cashed) were presented in evidence.  Mueller returned to the Indigo property and loaded the cattle with a friend.  He took pictures of the bad shape of the cattle, the numerous dead cattle mixed among them, and the lack of food and clean water.  The pictures showed the cattle stuck in feeders as they tried in vain to reach some tiny bits of food.  The pictures also showed them stuck

in mud, including one that had died between the time Mueller first saw it and when he returned to try and free it.  The pictures are disturbing.

Mueller purchased and loaded all the cattle—a total of twenty-eight stock cows (none carrying calves), six heifers, and one bull with a herniated penis from lack of use.  That was all of the cattle that remained alive.  Mueller took them to his father's farm near Manly, Iowa, where they raised cattle together.  He fed them, got them back to health, and eventually sold them for a profit.  Mueller testified that he and Bell had worked on various endeavors together over the years that involved Mueller helping Bell with his cattle.

Bell testified that Mueller was only supposed to take the cattle to custom feed.  Bell asserted that Mueller did not buy them.  Bell claimed Mueller ultimately stole the cattle from him when Mueller sold them.  Bell reported Mueller to the sheriff's office once he found out Mueller planned to testify for Moana in this proceeding about the cattle sale.  Bell claimed Mueller's payments to him were for other debts Mueller owed him.  Bell claimed the $10,000 check he received was for unspecified "other" debts, and the $6,000 was for a tractor.

Bell and DLB II presented evidence from Cole Neel who had a complicated relationship with Mueller.  Neel and Mueller at different times have gone from best friends to roommates to bitter enemies not on speaking terms.  Neel speculated that Mueller might have stolen the cattle from Bell.  Neel testified that he had been with Mueller in 2020, while they were still friends, when they loaded eight head of cattle from Bell's Indigo Avenue property and took them to a sale barn.  Bell later reported this as a theft of his cattle—and just recently convinced Neel that it was a theft by Mueller.  Bell also provided Neel with the information that Bell provided to the sheriff to help convince him that the March 2022 transaction was also theft.  Neel had no firsthand knowledge of the transaction in March of 2022, but claimed that Mueller was in fact custom feeding the cows.  Neel believed Mueller provided

6

custom feeding in the past.  Neel testified that Mueller told him that he and his father, Mike Mueller, did some custom feeding. Neel said that Dylan Mueller could not be trusted but said his father Mike was a good, honest man.

Mike Mueller testified on the second day of the evidentiary hearing, May 4, 2023.  Mike Mueller testified that he and Dylan only feed cattle they own and that they have never done custom feedings.  He verified that the cattle Dylan bought from Bell in March of 2022 were emaciated—and that the purchase price reflected the cattle's very poor state of health.  He was unequivocal that the cattle were purchased by Dylan from Bell and fed by the Muellers as their own.

The Court finds the evidence offered by Moana through Peggy Palms, Dylan Mueller, and Mike Mueller to be credible.  The Court finds the evidence offered by DLB II, Neel, and Bell himself to lack credibility.  The evidence from Bell and Neel was convoluted and often without any basis in objective fact.

The evidence offered by Moana was either based directed on, or entirely supported by, the objective record.  The documents DLB II filed with the State of Iowa before the bankruptcy filing were also consistent with the Moana testimony. The Biennial Reports of DLB II and the Consent Decree were both particularly persuasive.  Combined, they show DLB II denied farming or owning farmland and concluded that the DLB II land at Heather Lane was not agricultural land or the home of a farmer, respectively.

Moreover, the promissory note Dylan Mueller signed with the bank for the purchase of Bell's cattle and the check paid to Bell by Mueller contemporaneous with the transaction both further support Mueller's version of events.  As Mueller noted, if this was a custom feeding operation, he would not be borrowing money and paying Bell.  Rather, Bell would be paying Mueller.  There is no credible evidence of that in the record.

The testimony Bell offered purporting to show one instance where Bell provided feed for Mueller's custom feeding did not support Bell's claim that the March 2022 transaction in particular was for custom feeding. The evidence showed Mueller picked up feed, paid for by Bell, at a store approximately fifty miles south of Manly, Iowa. Mueller acknowledged the transaction and pointed out that it was related to cattle on land near that feed shop. He further pointed out he would never haul feed from such a distance to feed cattle in Manly. It would not be cost effective or make any sense. Mueller showed that Bell actually owed Mueller money. Bell provided some payment by getting feed for Mueller near land where Mueller kept other cows.

One other important factor should be noted. The Chapter 12 Trustee, Carol Dunbar, initially supported DLB II and Bell resisting dismissal. Dunbar believed, based on Bell's testimony at the 341 hearing, that he could be considered a family farmer meeting the eligibility standards. Dunbar was scheduled to testify to that effect at the evidentiary hearing on dismissal. After hearing the evidence presented by Moana and the convoluted explanations offered by Bell and Neel, Dunbar informed counsel for DLB II that she would no longer stand by her previous position on eligibility. In fact, Dunbar has now filed her own Motion to Dismiss for Debtor's failure to cooperate with her.

In sum, the evidence offered at the hearing by DLB II and Bell was not persuasive. The evidence offered by Moana was.

## II. CONCLUSIONS OF LAW

There are three issues pending before the Court. The first is whether this case should be dismissed either because (1) DLB II fails to qualify for Chapter 12 under 11 U.S.C. § 101(18)(B) or (2) because DLB II "has committed fraud in connection with the case" under § 1208(d). The second issue is whether Moana should be

allowed to amend its motion after the hearing to request conversion as an alternate remedy. The third and final issue is whether Moana should be subject to sanctions for allegedly violating the automatic stay.

The Court will address the first two issues together and will then address the sanctions last.

### a. Has Moana Proven Debtor fails to qualify for Chapter 12 Relief or Should be dismissed for Committing Fraud?

Moana claims that DLB II's case should be dismissed for either of two reasons: (1) Debtor's failure to qualify for bankruptcy under Chapter 12 or (2) Debtor's fraud in this case. The qualifications for being a corporate debtor under Chapter 12 are found at 11 U.S.C. § 101(18)(B):

> (B) corporation or partnership in which more than 50 percent of the outstanding stock or equity is held by one family, or by one family and the relatives of the members of such family, and such family or such relatives conduct the farming operation, and
>> (i) more than 80 percent of the value of its assets consists of assets related to the farming operation;
>> (ii) its aggregate debts do not exceed $11,097,350 [originally "$10,000,000", adjusted effective April 1, 2022] and not less than 50 percent of its aggregate noncontingent, liquidated debts (excluding a debt for one dwelling which is owned by such corporation or partnership and which a shareholder or partner maintains as a principal residence, unless such debt arises out of a farming operation), on the date the case is filed, arise out of the farming operation owned or operated by such corporation or such partnership; and
>> (iii) if such corporation issues stock, such stock is not publicly traded.

The statutory authority for dismissal or conversion for fraud is found at 11 U.S.C. § 1208(d):

> (d) On request of a party in interest, and after notice
> and a hearing, the court may dismiss a case under
> this chapter or convert a case under this chapter to a
> case under chapter 7 of this title upon a showing that
> the debtor has committed fraud in connection with
> the case.

Based on this Court's Findings of Fact above, dismissal would be appropriate here under either of these sections.

### i. Debtor fails to qualify as a "farming operation" for Chapter 12 relief under 11 U.S.C. § 101(21).

Whether DLB II conducts a "farming operation" at all is a threshold issue in this case. A "farming operation" includes "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21). Moana argues that DLB II does none of these, while DLB II claims it raises livestock.

The record shows two things on this issue: (1) Bell or DLB III, but not DLB II, raised livestock at some point and (2) Bell and DLB III no longer raise livestock because all livestock were sold to Dylan Mueller in March of 2022. Both of these findings are dispositive.

DLB II did not raise livestock or do any farming at any point. It said as much in its sworn biennial reports filed with the Secretary of State, in its discussions with Moana about the loan, and in the Consent Decree it agreed to and signed in the Iowa District Court. DLB II was set up for activities relating to the Heather Lane property, which only involved the repair and resale of farm equipment. No farming and certainly no livestock operation took place there. The record demonstrates that livestock were only ever held at the Indigo Avenue property—the DLB III operation.

10

DLB II and Bell attempt to argue around this by claiming that the cattle at Indigo Avenue actually did not belong to DLB III or even Bell individually, but instead were DLB II property being raised on DLB III land under a lease. There is no written lease and Bell's testimony claiming that it was a "rent-free" lease is simply not credible. Further, this testimony was flatly contradicted by the biennial reports of DLB II which state that it is not involved in family farming and has no interest in agricultural land. It is also contradicted by testimony from Peggy Palms about DLB II's description of its business—machinery repair and resale—leading up to the loan. It is further contradicted by the Consent Decree conclusion that DLB II does not involve any agricultural land. Finally, it is contradicted by the purpose of having separate legal entities—DLB II and DLB III—which were specifically and intentionally separated by the land and work at each particular location. Alleging a non-written, rent-free lease for the Indigo Avenue land to do all of DLB II's farming activity there (and apparently no separate DLB III activity) is a way of blatantly disregarding the corporate forms set up and used by Bell. In short, DLB II held itself out as, and borrowed money as, a non-farming business operation and did no farming at its only location—Heather Lane.

Any and all livestock that were "raised" were indisputably located at Indigo Avenue—the DLB III location. The livestock were kept by DLB III or perhaps personally by Bell. Even if the livestock could somehow be tied to DLB II—despite all rational indications to the contrary—DLB II sold all of its cattle to Dylan Mueller before the bankruptcy was filed and no farming operation of any sort remained.

### ii.  DLB II fails to qualify for Chapter 12 under either the asset or debt standards of § 101(18)(B)(i)+(ii).

To qualify for Chapter 12, DLB II must be a "farming operation" under 11 U.S.C. § 101(21) and must also show that 80% of its assets and not less than 50% of

its debt arise out of or relate to the farming operation. Even if DLB II qualified as a "farming operation," it cannot meet the asset and debt requirements of § 101(18)(B). DLB II has not shown, nor can it show, that 80% of its assets relate to a farming operation. Even assuming that DLB II had shown (which it did not) that its cattle were being "raised" on DLB III land rent-free, DLB II still falls short of showing that 80% of its assets are related to a farming operation. Its filing indicates $70,000 of cattle as assets, and $13,000 more of miscellaneous farm assets. Its total assets are nearly $250,000, and $83,000 of alleged farm assets amounts to around 33% of the total assets. DLB II still needs to show that the Heather Lane property—the bulk of DLB II's assets it values at $165,000—are related to a "farming operation." There is simply nothing in the record to show this. There is zero evidence of a "farming operation" at Heather Lane. Bell's bare suggestion that he intended to move a cattle operation there eventually does not help his case and, in fact, is not credible.

Similarly, DLB II cannot show that at least 50% of its debts arise out of a "farming operation." Again, the debts listed in DLB II's schedules are approximately $262,000. Only $32,042 is debt other than the Moana loan. That is only 12.2% of total debt. DLB II had to show that the debt owed to Moana arises out of the farming operation in order to meet the 50% threshold required by 11 U.S.C. § 101(18)(B). DLB II offered no such evidence. It never even argued that it used any Moana loan money to purchase livestock or support a livestock operation. It is undisputed that the Moana loan money was for fixing the house at Heather Lane, the buildings at Heather Lane, and acquiring farm equipment to repair and resell. Again, Bell and DLB II's suggestion that fixing up Heather Lane was for the purpose of moving a livestock operation there is simply without support in the record. Therefore, this Court concludes that DLB II does not qualify as a family farmer and therefore inappropriately filed under Chapter 12 of the Bankruptcy Code.

### iii. **Dismissal under § 1208(d) for DLB II's fraud in connection with the case.**

Moana argues that DLB II committed fraud in the case by attempting to pass itself off as a farm operation in the face of a factual record that was clearly to the contrary. For all the reasons noted in the Findings of Facts and the discussion above, the Court concludes that Moana has proved DLB II's fraud by the overwhelming evidence in the record. The Court concludes Moana met its burden under 11 U.S.C. § 1208(d) by providing overwhelming evidence of fraud.

### iv. **Motion to Amend to include Conversion to Chapter 7 instead of Dismissal.**

After the evidentiary hearing, Moana requested that the Court allow it to amend its Motion to Dismiss to include a request to convert the case to Chapter 7. Moana contends that conversion was tried by implied consent of the parties at the April 20, 2023 hearing and thus moves to "amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2). Debtor objects to Moana's motion by distinguishing contested and adversary bankruptcy proceedings and arguing that since the present case is a contested matter, Fed. R. Bankr. P. 7015, and by extension Fed. R. Civ. P. 15, are inapplicable. The Court rejects Debtor's arguments and finds that the issue of conversion is based on the same factual record, and Moana is allowed conversion in conformity with the evidence. The Court thus considers both conversion and dismissal under 11 U.S.C. § 1208(d).

### III. MOTION FOR SANCTIONS

Debtor has requested sanctions against Moana for violating the automatic stay because Moana rescheduled a Sheriff's sale of Debtor's property rather than canceling it. Thus, Debtor alleges the sale was improperly rescheduled for March 3,

2023 (post-petition), advertised on the sheriff's website, and that people came onto the property to inspect it prior to the sale, causing emotional harm to Debtor. Moana objects, explaining that once it realized the sale was rescheduled, it took immediate action to cancel the sale. Moana emphasizes that the sale was inadvertently rescheduled and the people inspecting the property were third-party trespassers not there at the behest of Moana.

The filing of a bankruptcy petition imposes the automatic stay of § 362 which prohibits creditors from engaging in "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(5); see also In re Forkner, No. 10–01585, 2010 WL 5462543, at *3 (Bankr. N.D. Iowa 2010). A creditor may not continue any pre-petition judicial action against the debtor or enforce a judgment obtained before the commencement of a debtor's case. 11 U.S.C. §§ 362(a)(1), (2).

To recover for damages, the Debtors must show "(1) the creditor violated the automatic stay; (2) the violation was willful; and (3) the debtor was injured by the violation." Marino v. Seeley (In re Marino), 437 B.R. 676, 678 (B.A.P. 8th Cir. 2010). A violation is willful when "the creditor acts deliberately with knowledge of the bankruptcy petition." Knaus v. Concorida Lumber Co., Inc. (In re Knaus), 889 F.2d 773, 775 (8th Cir. 1989). A violation is still "willful" even where the creditor does not have the specific intent to violate the automatic stay. In re Dencklau, 158 B.R. 796, 800 (Bankr. N.D. Iowa 1993).

Here, Moana does not dispute the fact that it had notice of the Debtor's pending bankruptcy case. Indeed, Moana specifically references its knowledge of the case in its Objection to Sanctions. See Doc. 105 ("Immediately after Debtor filed its Petition on December 29, 2022, for relief under Chapter 12 of the Bankruptcy Code, Moana *postponed* the sheriff's sale . . . .")(emphasis added).

14

The analysis therefore turns on whether Moana engaged in actions that constituted a "willful" violation of the statute. The record shows that the sale was postponed in hopes that this case would ultimately be dismissed. Moana failed to continue monitoring the case's progress, which resulted in an unintentional automatic reschedule by the County. Moana notes it did not reschedule the sale but inadvertently failed to make sure it did not get rescheduled by the County. The Court finds that this inadvertent failure on the part of Moana is merely a technical or clerical error that does not rise to the level of being a "willful" violation, let alone qualify as "egregious, intentional misconduct" required for the Court to award the punitive damages that Debtor is requesting. In re Ketelson, 880 F.2d 990, 993 (8th Cir. 1989); see also In re Reisen, No. 03–01999, 2004 WL 764628, at *6 (Bankr. N.D. Iowa Mar. 4, 2004) (unwilling to find a violation of the automatic stay after concluding that the defendant's actions pursuant to a filing error were "technical in nature and inadvertent"); In re Adams, No. 01-02576, 2002 WL 844350 (Bankr. N.D. Iowa Apr. 19, 2002) (denying debtors' application for contempt after finding a "technical" violation of the automatic stay by holding that a mechanical application of the bankruptcy code absent full consideration of the violation's context was inappropriate); In re Carter, 502 B.R. 333 (B.A.P. 8th Cir. 2013), aff'd, 583 F. App'x 560 (8th Cir. 2014) (finding that "although [the defendant's] action violated the automatic stay . . . [the] violation was technical and not willful in nature").

The Court finds no willful violation of the automatic stay here. Moreover, Debtor has failed to show adequate injury to support recovery. In the Eighth Circuit, recovery of attorneys' fees under 11 U.S.C. § 362(k)(1) is inappropriate in the absence of an award of actual damages. Lovett v. Honeywell, 930 F.2d 625, 629 (8th Cir. 1991). As for punitive damages, the same rule applies. The Eighth Circuit has interpreted the term "appropriate circumstances" in § 362(k)(1) that trigger punitive damages as requiring "egregious, intentional misconduct on the violator's part." In

15

re Ketelson, 880 F.2d 990, 993 (8th Cir. 1989).  See In re West, No. 12-03377-LMJ13, 2014 WL 1419805, at *6 (Bankr. S.D. Iowa Apr. 11, 2014) (standard of proof for psychological injury not met by being "a little irritated," embarrassed, disappointed, or nervous).  The record shows no evidence of any actual injury here and therefore sanctions, punitive or otherwise, are inappropriate.

## IV.   ORDER

For all of the reasons set forth herein, the Court concludes that Moana's Motion to Amend After Trial to request Conversion in lieu of Dismissal is GRANTED.  The Moana Motion to Convert to Chapter 7 is GRANTED and this case is hereby converted from Chapter 12 to Chapter 7.

FURTHER, the Debtor's Motion for Sanctions is DENIED.  Debtor's Motion to Continue Hearing (Doc. 134) is also DENIED as moot.

Ordered:

September 8, 2023

Thad J. Collins
Chief Bankruptcy Judge